983 So.2d 1205 (2008)
Sue ELLISON, Appellant,
v.
STATE of Florida, Appellee.
No. 2D07-2423.
District Court of Appeal of Florida, Second District.
May 23, 2008.
Rehearing Denied June 30, 2008.
Colleen M. Glenn, Bradenton, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Timothy A. Freeland, Assistant Attorney General, Tampa, for Appellee.
PER CURIAM.
Sue Ellison appeals a judgment for exploitation of an elderly person or disabled adult pursuant to section 825.103(1)(a) and (2)(b), Florida Statutes (2005). Because the trial court erred in denying Ms. Ellison's motion for judgment of acquittal, we reverse.
The denial by the trial court of a motion for judgment of acquittal is subject to de novo review by this court. Pizzo v. State, 910 So.2d 287 (Fla. 2d DCA 2005).
The following facts were adduced at trial: Sue Ellison had known and lived in the same mobile home park as the alleged victim, Karl Kadlik, for eighteen years. In that time, they developed a friendly relationship and began to spend a substantial amount of time together. In 2004, Mr. Kadlik became ill and went to live with his daughter, Elese Haiges, who had recently moved to the area. Ms. Haiges had her father's will updated, obtained a power of attorney, and began managing Mr. Kadlik's financial affairs. Their relationship soured. Mr. Kadlik called the Department of Children and Families (DCF), complaining that his daughter was mishandling his finances. DCF investigated but found no evidence of abuse.
In August or September 2004, Mr. Kadlik was evaluated under Florida's Baker Act but was found to be competent and was released to a nursing home. While in the nursing home, Mr. Kadlik continued to accuse his daughter of mishandling his finances. In January 2005, he told Ms. Haiges he no longer wanted to have anything *1206 to do with her. In April 2005, Mr. Kadlik was released from the nursing home at his own request. Mr. Kadlik refused to return to his daughter's residence and instead went to live in the home of Ms. Ellison and her husband. Mr. Kadlik did not return to his own mobile home because it was in undisputedly deplorable condition at the time.
The State's case, as summarized in its probable cause affidavit, was that upon signing Mr. Kadlik out of the nursing facility, Ms. Ellison took possession of $4200 in cash which was being held for him by the nursing home. She closed Mr. Kadlik's existing bank accounts and opened new ones, in the process obtaining $2504.01 from one of the accounts. She made questionable ATM withdrawals and purchase transactions amounting to a total of $3216.71 using Mr. Kadlik's debit card. She caused Mr. Kadlik to transfer his ownership interest in the mobile home park property to joint tenancy with herself. Based on these facts, the State charged Ms. Ellison with violating Section 825.103(1)(a) and (2)(b).[1] Section 825.103(1)(a) defines exploitation of an elderly person as follows:
(a) Knowingly, by deception or intimidation, obtaining or using, or endeavoring to obtain or use, an elderly person's or disabled adult's funds, assets, or property with the intent to temporarily or permanently deprive the elderly person or disabled adult of the use, benefit, or possession of the funds, assets, or property, or to benefit someone other than the elderly person or disabled adult, by a person who:
1. Stands in a position of trust and confidence with the elderly person or disabled adult; or
2. Has a business relationship with the elderly person or disabled adult . . .
(emphasis added). Thus, the State was required to prove that Ms. Ellison, while standing in a position of trust and confidence with Mr. Kadlik, used deception or intimidation to obtain Mr. Kadlik's funds or assets with the intent of depriving Mr. Kadlik of the use of those funds either temporarily or permanently. At oral argument, the State conceded that there was no evidence of intimidation, but contended that the evidence was sufficient to establish deception. Therefore, the State's case hinged on whether it was able to prove the element of deception. Section 825.101(3), Florida Statutes (2005) defines deception as:
(a) Misrepresenting or concealing a material fact relating to:
1. Services rendered, disposition of property, or use of property, when such services or property are intended to benefit an elderly person or disabled adult;
2. Terms of a contract or agreement entered into with an elderly person or disabled adult; or
3. An existing or preexisting condition of any property involved in a contract or agreement entered into with an elderly person or disabled adult; or
(b) Using any misrepresentation, false pretense, or false promise in order to induce, encourage, or solicit an elderly person or disabled adult to enter into a contract or agreement.
Here, the State failed to prove that Ms. Ellison deceived Mr. Kadlik with the intent to temporarily or permanently deprive him of his funds, assets, or property. The State offered no direct or indirect evidence *1207 that Ms. Ellison had ever obtained actual possession of the allegedly missing $4200 or the $2504.01, much less evidence that she did so by deception. The State's claim that Ms. Ellison helped Mr. Kadlik close his existing bank accounts and open new ones is supported by the record; however, the evidence suggests that Mr. Kadlik desired to close these accounts because he was convinced his daughter was mishandling his finances. The State proved nothing more than that Ms. Ellison helped Mr. Kadlik accomplish these tasks.
Ms. Ellison did not deny that she made several ATM withdrawals and debit purchases using Mr. Kadlik's debit card. However, she testified that he was with her when the ATM withdrawals were made and that any money she withdrew or spent was at Mr. Kadlik's request or on his behalf. For example, Ms. Ellison testified that when she and her husband took Mr. Kadlik out to eat or boating, Mr. Kadlik insisted on paying for gas. The State offered no evidence contradicting this testimony. In addition, numerous receipts were entered into evidence showing that Ms. Ellison had purchased nearly $4000 in building supplies, bedding, landscaping materials and other items which were used for improvements to Mr. Kadlik's mobile home. The State did not refute Ms. Ellison's claim that the items were purchased for Mr. Kadlik's home but argues that this proves that Ms. Ellison's intent was to make Mr. Kadlik's mobile home suitable for habitation for herself. Even if this were true, it does not establish that Ms. Ellison engaged in any false pretense or deception.
With regard to the transfer of the mobile home property itself, there was evidence that Ms. Ellison originally attempted to purchase the property from Mr. Kadlik for $23,000. Because the lot on which the mobile home was situated was subject to a ninety-nine-year leasehold interest in land owned by a cooperative, the approval of the board of directors of the cooperative was necessary. When the board of directors refused to authorize the outright transfer of the property to Ms. Ellison, she and Mr. Kadlik sought out the services of an attorney. The attorney prepared a deed changing ownership of the Mr. Kadlik's leasehold interest to Mr. Kadlik and Ms. Ellison as joint tenants with rights of survivorship, prepared a new will removing Ms. Haige as a beneficiary, and prepared a revocation of Ms. Haige's power of attorney. The attorney, testifying as a State witness, stated that Mr. Kadlik had made it clear that he did not want his daughter to get anything upon his death. He also testified that he had confirmed that there were no incompetency proceedings instituted against Mr. Kadlik and that Mr. Kadlik was alert and responsive during his meetings with him. He also stated that Ms. Ellison was not present when these documents were signed, and that he saw no evidence of coercion, intimidation, or deception in the relationship between Mr. Kadlik and Ms. Ellison. Although there is some question as to whether any money changed hands during the attempted sale of the property for $23,000, there is nevertheless no evidence of deception. Instead, the evidence more strongly suggests that Mr. Kadlik was a willing participant in the efforts to transfer ownership of the property to Ms. Ellison.
Mr. Kadlik testified as a State witness but his testimony often conflicted with undisputed facts. The trial court noted that Mr. Kadlik, who was ninety-six years old at the time of the trial, struggled to answer the questions and took long periods of time to respond. Although the State did not place into question Mr. Kadlik's competence at the time of the events leading *1208 to Ms. Ellison's arrest,[2] his memory of these events appears to have been substantially impaired at the time of Ms. Ellison's trial.
Based on the record before this court, we conclude that the evidence presented by the State was insufficient as a matter of law to prove that Ms. Ellison had committed the charged offense. Therefore, the trial court erred in denying Ms. Ellison's motion for judgment of acquittal. As a result, we reverse Ms. Ellison's conviction for exploitation of an elderly person and remand for discharge.
Reversed and remanded.
NORTHCUTT, C.J., and KELLY, J., and HARDT, FREDERICK R., Associate Judge, Concur.
NOTES
[1] Subsection (2)(b) provides that if the funds, assets, or property involved in the exploitation is valued at or above $20,000 but less than $100,000, the offender commits a felony of the second degree.
[2] The State alleged that Mr. Kadlik "appears to be suffering from the infirmities of aging and does not appear capable of making proper financial decisions." However, the State did not charge Ms. Ellison with violating section 825.103(1)(b), wherein a person obtains an elderly person's assets when the elderly person lacks capacity to consent.